DA 08-0083

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 247

PATSY ANN TUCKER, Personal Representative of
the Estate of CATHRYN CLAIRE ROSE TUCKER,

      Plaintiff and Appellee,

  v.

FARMERS INSURANCE EXCHANGE,
a Reciprocal Inter-Insurance Exchange,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
                  In and For the County of Missoula, Cause No. DV 03-741
                  Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Mark S. Williams, Williams Law Firm, P.C., Missoula, Montana

      For Appellee:

          Alexander (Zander) Blewett, III, Hoyt & Blewett, PLLC, Great Falls,
Montana

                        Submitted on Briefs:  December 24, 2008

                                Decided:  July 21, 2009

Filed:

            _____
                            Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1  Farmer's Insurance Exchange (FIE) appeals from a jury award of $516,000 in wrongful death damages to Patsy Ann Tucker (Tucker) in the Fourth Judicial District Court, Missoula County. The court also awarded attorney fees, costs, and accrued interest. We affirm.

¶2  FIE presents the following issues for review:

¶3  Whether the District Court properly denied FIE's motion for a directed verdict on Tucker's underinsured motorist (UIM) claim for wrongful death damages.

¶4  Whether the District Court properly applied Idaho law in determining the wrongful death damages.

¶5  Whether the District Court correctly denied collateral source offsets from Tucker's wrongful death damages award.

## PROCEDURAL AND FACTUAL BACKGROUND

The Accident

¶6  Tucker is a co-personal representative of the estate of her daughter, Cathryn Claire Rose Tucker (Cady Tucker). Cady Tucker, age 11, died on August 15, 2002, following an automobile accident that took place north of Seeley Lake on Montana Highway 83. Cady Tucker lived in Idaho Falls, Idaho, with her mother and her mother's husband, Robert Starr (Starr), at the time of the accident. Cady Tucker's biological father is John Hoctor (Hoctor). Hoctor is a co-personal representative of Cady Tucker's estate.

2

¶7 Cady Tucker rode in the front seat of a vehicle owned and operated by Robert Cushman (Cushman), a Montana resident. Jamie Robbins (Robbins), Cady Tucker's cousin, rode in the backseat of Cushman's vehicle. Janie McNair (McNair), also a Montana resident, negligently drove her vehicle over the centerline and collided head-on with Cushman's vehicle. Cushman and Robbins suffered serious injuries. Cady Tucker died from her injuries after living an appreciable amount of time.

Insurance Coverage

¶8 Safeco insured Cushman under two separate policies with UIM limits of $100,000 per person and $300,000 per accident. Safeco agreed to stack the policies and paid $200,000 to Tucker and Hoctor in equal shares of $100,000. All parties agreed that these monies constituted survivorship damages under Montana law. Tucker and Hoctor divided the survivorship damages in accordance with the succession laws of Montana.

¶9 State Farm insured McNair for liability coverage of $25,000 per person and $50,000 per accident. McNair collided with two separate vehicles in this accident. McNair's negligence caused the death of Cady Tucker and caused severe injuries to Cushman, Robbins, and three passengers in the vehicle trailing Cushman's vehicle. State Farm admitted to McNair's negligence. As a result, State Farm provided additional coverage of $25,000 per person and $50,000 per accident. State Farm divided its $100,000 limit among the injured parties, including Cady Tucker's heirs, with a $50,000 per person limitation. State Farm paid survivorship damages in the amount of $35,625 to Tucker and Hoctor in equal shares of $17,812.50.

¶10    Tucker and Hoctor agreed that the Safeco and State Farm monies constituted survivorship damages and thus split these amounts equally as co-personal representatives of Cady Tucker's estate. They further agreed that any money damages received in the future would not be divided equally as Tucker had provided a vast majority of Cady Tucker's financial support and care.

¶11    Starr had purchased two UIM policies that insured Tucker and Cady Tucker. The first policy, Farmers Insurance Company of Idaho (FICI), insured them for $250,000 per person. The FICI policy contained a provision that Idaho law governed the contract. Consistent with Idaho law, the FICI policy contained a mandatory arbitration provision. The second policy, FIE, insured both Tucker and Cady Tucker for $1,000,000 per occurrence. Starr had purchased the FIE policy to provide excess coverage above the FICI policy. The FIE policy contained no choice of law provision and no arbitration provision.

¶12    Tucker initially demanded the $250,000 policy limit in UIM coverage from FICI. John Evers (Evers), a general adjuster for FICI and FIE, initially informed Tucker that policy exclusions in both the FICI and FIE policies barred coverage. Evers later confirmed the insurer's intent, however, to address the UIM claims under both policies. Evers opined that coverage would be subject to an offset of the amount recovered from the tortfeasor and benefits received from Cushman's UIM coverage. Tucker detailed the damages that had been incurred from Cady Tucker's death and demanded that FICI and

4

FIE pay the entire limit of $1,500,000 to the co-personal representatives of Cady Tucker's estate.

Idaho Court Proceedings

¶13    FICI responded by filing a complaint in Bannock County, Idaho, on March 13, 2003, that sought to compel arbitration of the UIM claim. FIE joined the complaint five days later. Three days later, on March 21, 2003, Tucker and Hoctor filed a complaint in Montana that sought damages against McNair for negligence and asserted UIM claims against FICI and FIE. FICI and FIE filed motions to dismiss the Montana action. The District Court dismissed the Montana action on June 23, 2003, based on comity and the fact that the Idaho court was considering the question of whether the insurance policies compelled arbitration. The Idaho district court interpreted the insurance contracts and granted FICI's motion to compel arbitration as its insurance policy contained an express arbitration clause. The Idaho district court denied FIE's motion to compel arbitration as its insurance policy did not contain an arbitration clause.

¶14    Tucker settled her claim with FICI after providing FICI with evidence that Cady Tucker had lived an appreciable time after the accident. Tucker and Hoctor agreed to discharge their UIM claim against FICI under Idaho law for the $250,000 policy limit. Hoctor received $70,000 and Tucker received $180,000. The parties did not apportion this settlement between survivorship damages and wrongful death damages. The Idaho district court dismissed this portion of the case with prejudice on December 29, 2003.

5

¶15 Tucker and Hoctor filed a second complaint in Montana on September 2, 2003, that sought damages against FIE. FIE moved to dismiss the second Montana action on June 30, 2004. The Montana court declined to rule on the dismissal motion and stayed the action pending resolution of the Idaho proceedings.

¶16 FIE sought leave to file an amended complaint for declaratory relief in the Idaho action on November 10, 2003. FIE sought a declaratory judgment to determine whether Tucker and Hoctor could recover under the FIE's UIM coverage and the amount of such recovery. The Idaho district court allowed FIE leave to amend its complaint in order to pursue a declaratory judgment "to determine whether FIE must pay [damages] and to whom it must pay the damages." The court refused, however, to allow FIE to determine in such action "the amount of damages [Tucker and Hoctor] may seek from FIE in a wrongful death action and/or breach of contract action."

¶17 FIE appealed to the Idaho Supreme Court. The Idaho Supreme Court agreed that no authority supported FIE's efforts to maintain a declaratory judgment action to determine damages when a wrongful death and survivorship action was pending in Montana to address the identical issue. *Farmers Ins. Exchange v. Tucker*, 125 P.3d 1067, 1071 (Idaho 2005).

¶18 The Idaho Supreme Court admitted that FIE's argument contained "some initial curb appeal" as the case involved the interpretation of an insurance policy issued in Idaho to Idaho insureds. *Tucker*, 125 P.3d at 1071. The court further recognized that most of the likely trial witnesses on the damages issue lived in Idaho. The court ultimately

6

determined, however, that the remaining issues in the case boiled down to the question of how much FIE must pay under its policy. *Tucker*, 125 P.3d at 1071. The court concluded that "the only issue of substance to be determined is the factual question as to the amount of damages, a question which is pending in the first-filed regular action in the state of Montana." *Tucker*, 125 P.3d at 1071.

Montana Court Proceedings

¶19 The Montana District Court held a jury trial on April 6, 9, and 10, 2007, on Tucker's claim for wrongful death damages. Tucker alleged that FIE was contractually obligated under its UIM policy for her wrongful death damages. The jury awarded Tucker damages in the amount of $516,000.

¶20 The District Court held a hearing on September 5, 2007, to address the role or extent of collateral sources. FIE did not present any evidence or call any witnesses. FIE instead argued that Tucker had received insurance settlements that covered the same damages that the jury had awarded. FIE claimed that it was entitled to offsets to the jury award for all amounts paid by other sources of insurance. The District Court determined that FIE had failed to meet its burden of proving specific amounts that could be defined as survivorship damages and specific amounts that could be defined as wrongful death damages that would entitle it any offsets.

¶21 FIE sought to have the court revisit its earlier ruling that Idaho law applied to the interpretation of the contract. The District Court affirmed that Idaho law applied to control the legal construction and effect of FIE's policy. The District Court pointed to

7

our reliance on § 188 of the *Restatement (Second) Conflict of Laws* to determine the state that possesses a materially greater interest in the particular contract issue and the applicable state's law in the absence of the parties' effective choice of law.

¶22    The court considered the factors in § 188. The parties agreed that the policies had been issued in Idaho, to Idaho residents, covering Idaho vehicles. Tucker resides in Idaho, as did Cady Tucker. The court determined that the location of the accident and the fact that the negligent driver was from Montana provided the only Montana connections. The Montana driver had failed to answer the complaint. Thus, the court determined that the action centered on the interpretation of Idaho insurance policies issued to Idaho residents. FIE appeals.

## STANDARD OF REVIEW

¶23    We review de novo issues of law, including a trial court's decisions on directed verdict, choice of law, and collateral source offset. *Omimex Canada v. State, Dept. of Revenue*, 2008 MT 403, ¶ 16, 347 Mont. 176, 201 P.3d 3.

## DISCUSSION

¶24    *Whether the District Court properly denied FIE's motion for a directed verdict on Tucker's underinsured motorist (UIM) claim for wrongful death damages.*

¶25    Section 27-1-513, MCA, allows the personal representative of the decedent's estate to maintain an action for wrongful death damages. Any damages awarded in wrongful death causes of action are personal to the decedent's heirs and do not belong to the decedent's estate. *In re Estate of Lambert*, 2006 MT 229, ¶ 16, 333 Mont. 444, 143

8

P.3d 426. FIE concedes that Tucker had the authority to prosecute a wrongful death action for her own damages from Cady Tucker's death.

¶26 FIE argues, however, that its UIM policy covered only bodily injury to its insured. FIE claims that Tucker failed to present evidence at trial of bodily injury suffered by her as the insured person. FICI's UIM policy provides that FICI will pay all amounts that its insured legally would be entitled "to recover as damages from the owner or operator of an uninsured motor vehicle because of bodily injury sustained by the insured person." The FICI UIM policy further provides that the "bodily injury must be caused by accident and arise out of the ownership, maintenance or use of the uninsured motor vehicle." The FICI policy defines bodily injury as "bodily injury to or sickness, disease or death of any person." FIE added an underinsured motorist endorsement under which it "agreed that this policy will provide Uninsured and/or Underinsured Motorist Coverage(s) payable to you and any other insured under this policy, to the extent that either or both coverages are a part of the underlying insurance."

¶27 FIE contends that it added UIM coverage to its umbrella policy by endorsement. As a result, FIE argues that its umbrella policy provides UIM coverage only to the extent that the underlying insurance policy provides coverage. The FICI policy constitutes the underlying policy. FIE further contends that the FICI UIM policy provides that Tucker may recover only for bodily injury sustained by her as the insured person. FIE argues that Cady Tucker suffered the bodily injury in this case. FIE claims that FICI covered these bodily injury damages suffered by Cady Tucker when it settled its claim for the

9

policy limit. Thus, FIE takes the position that Tucker's survivorship claim arose from "bodily injury" to Cady Tucker, the insured, and that claim had been covered and paid by the terms of the UIM policy. As a result, FIE alleges that the District Court improperly denied its motion for directed verdict in light of Tucker's failure to establish her own bodily injuries as part of Tucker's wrongful death claim.

¶28 FIE relied upon our decision in *Jacobsen v. Farmers Union Mut. Ins. Co.*, 2004 MT 72, 320 Mont. 375, 87 P.3d 995, before the District Court. This Court limited "bodily injury" in *Jacobsen* to physical injury to a person caused by an accident. The Court excluded emotional and psychological injuries from the definition of "bodily injury," "including physical manifestations resulting therefrom." *Jacobsen*, ¶ 29. We recently overruled *Jacobsen* in *Allstate Ins. Co. v. Wagner-Ellsworth,* 2008 MT 240, ¶ 13, 344 Mont. 445, 188 P.3d 1042.

¶29 In *Allstate* we construed the term "bodily injury" within an insurance policy to include mental or psychological injury that is accompanied by physical manifestations. *Allstate*, ¶ 40. There a child had been injured severely when struck by a car. The child's mother and brother claimed emotional and physical injuries. *Allstate*, ¶ 5. The definition of "bodily injury" in the Allstate policy included "physical harm to the body, sickness, disease, or death." *Allstate*, ¶ 40.

¶30 The Allstate policy covered the bodily injuries of the child who had been struck by the car. *Allstate*, ¶ 18. The mother and brother alleged that they too had sustained damages "because of" the child's bodily injury and that their claims fell within the

10

contract's language that obligated Allstate to pay damages "because of [a] bodily injury sustained by any person." The mother and brother underwent therapy for the brother's withdrawal and the mother's suffering from stress, migraine headaches, a rapid heart beat when she hears sirens, physical pain, and depression. *Allstate*, ¶ 5.

¶31 We reviewed numerous decisions from other jurisdictions and recognized the difficulty in distinguishing between injuries that have physical manifestations from those that do not. *Allstate*, ¶ 41. We concluded that each case necessarily must be judged by its own facts to determine whether the alleged injuries are sufficiently akin to physical injuries to fall within coverage for "bodily injury." *Allstate*, ¶ 42. Conditions susceptible to medical diagnosis and treatment distinguish physical injuries from mental injuries. *Allstate*, ¶ 42.

¶32 FIE opines that Tucker's testimony at trial consisted of symptoms associated with grief, namely sleeplessness and loss of appetite. FIE contends that these symptoms do not constitute physical ailments and thus are distinguishable from emotional distress. Tucker's family and friends described her as having been socially and physically active with no emotional or physical problems before Cady Tucker's death. They further testified that Tucker had virtually no relationship with her husband after the death of her daughter. They described long hours that Tucker now spent at work and the large amounts of time that she spent either at her daughter's grave or honoring her daughter's memory in some fashion.

11

¶33    Tucker's neuropsychologist expert, Dr. Lloyd, examined and tested Tucker in 2006. Dr. Lloyd testified that four years after Cady Tucker's death, Tucker suffered from chronic PTSD and chronic depression as a result of seeing her daughter's body inside of a body bag covered in blood with the side of her face crushed. Dr. Lloyd testified that Tucker exhibited visible signs of distress when she talked about seeing her daughter in such a condition or the events surrounding her daughter's death. Dr. Lloyd explained that Tucker visibly would sweat and likely would have an increased heart rate and an increased respiration rate. Dr. Lloyd believed Tucker had exhibited psychotic features with her depression when she would hear her daughter's voice, when she would see her daughter walking beside her, or when she would see her daughter kneeling beside her praying.

¶34    FIE's psychiatric expert, Dr. Martin, testified that four years after Cady Tucker's death, Tucker suffered in varying degrees at various times from PTSD, depression, complicated bereavement, and obsessionality. Dr. Martin noted that he agreed with Dr. Lloyd's examination results, except for the psychotic features associated with depression, medication, and treatment. Both experts agreed, however, that Tucker's emotional problems stem from her daughter's death and recommended future therapy.

¶35    Tucker suffered mental injuries with physical manifestations that would be covered under the FIE's UIM policy's definition of "bodily injury." *Allstate*, ¶ 43. We reiterate that a court must evaluate each claim for bodily injury in the form of mental injuries with physical manifestations on a case by case basis. *Allstate*, ¶ 42. We

12

conclude, as did the District Court, that the evidence and testimony presented at trial, both from the expert witnesses and Tucker's family and friends, established that Tucker suffered from mental injuries with physical manifestations. These injuries fall within FIE's UIM definition of "bodily injury." *Allstate*, ¶ 43. The District Court properly denied FIE's motion for a directed verdict.

¶36 *Whether the District Court properly applied Idaho law to an Idaho insurance policy.*

¶37 FIE argues that this Court historically has applied Montana law to insurance policies that provide coverage for automobile accidents that occur in Montana. FIE seeks application of the place of performance test set forth in § 28-3-102, MCA, to determine which state's law governs the contract. FIE contends that Tucker argued in Idaho courts and before the District Court here that Montana law applied to her survivorship claim. FIE claims that Tucker received the full benefit bestowed by Montana jurisdiction and the application of Montana law to the survivorship action. FIE thus contends that Tucker now should not be permitted the benefit of having the District Court apply the more favorable Idaho law to her wrongful death action.

¶38 The law of the place of performance governs a contract's interpretation unless the terms of the insurance contract provide otherwise. *Mitchell v. State Farm Ins. Co.*, 2003 MT 102, ¶ 20, 315 Mont. 281, 68 P.3d 703. Tucker argues, however, that collateral estoppel bars FIE's challenge to the District Court's decision to apply Idaho law. Collateral estoppel bars litigants from reopening questions that had been essential to an

13

earlier judgment. *Baltrusch v. Baltrusch*, 2006 MT 51, ¶ 18, 331 Mont. 281, 130 P.3d 1267.

¶39 Tucker points out that the Idaho district court interpreted the FICI and FIE insurance contracts in accordance with Idaho law. FICI and Tucker agreed to that interpretation in settling Tucker's guardianship claim. FIE did not appeal the Idaho district court's decision. FIE defends its failure to appeal on the grounds that it "was merely a bystander" once the Idaho district court denied its motion to compel arbitration of the dispute between Tucker and FIE. FIE ignores the fact, however, that it sought further protection under Idaho law when it filed a declaratory judgment action to determine damages.

¶40 Moreover, Tucker points to the fact that the Idaho district court inquired as to the remaining issues to be litigated. FIE's counsel responded that he did not "think there is anything remaining to be litigated in Idaho because there is no coverage issue. It's just a question of determining what is the amount due under the policy." *Tucker*, 125 P.3d at 1071. FIE's counsel further represented that the remaining litigation involved "purely a question of how much damages are recoverable under the facts of the case." *Tucker*, 125 P.3d at 1071. We need not resolve definitively the issue of collateral estoppel, however, as the District Court reached the correct conclusion with respect to its decision to apply Idaho law to FIE's UIM insurance contract.

¶41 We recently adopted the "most significant relationship" approach contained in the *Restatement (Second) of Conflict of Laws* to determine the applicable state law in

14

determining a choice-of-law conflict in contract disputes. *Modroo v. Nationwide Mut. Fire Ins. Co.*, 2008 MT 275, ¶ 50, 345 Mont. 262, 191 P.3d 389. Section 188 of the *Restatement* governs situations in which the contracting parties fail to select an effective choice of law. *Modroo*, ¶ 55.

¶42    In *Modroo*, a Ohio resident was killed in Montana and her personal representative argued that the court should construe ambiguous choice of law language in a UIM policy in favor of the insured. *Modroo*, ¶ 41. This Court's review of Modroo's policy's provisions determined that Montana law applied to Modroo's tort claim and that Ohio law governed the interpretation of the insurance contract. *Modroo*, ¶ 45. We agreed with the district court that Montana did not have a materially greater interest in the case and that Ohio law governed Modroo's entitlement to UIM coverage. *Modroo*, ¶ 52.

¶43    We have focused on the contacts enumerated in § 188(2) of the *Restatement* to determine whether Montana possesses a materially greater interest in an issue than the parties' chosen state: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." *Keystone, Inc. v. Triad Systems Corp.*, 1998 MT 326, ¶ 10, 292 Mont. 229, 971 P.2d 1240. Application of these criteria reveals that Idaho possesses a materially greater interest in the issue than Montana. *Modroo*, ¶ 58.

¶44    The parties agree that the policies had been issued in Idaho, to Idaho residents, providing coverage to Idaho vehicles. Idaho constitutes the place of contracting and the

15

place of negotiating the contract. *Modroo*, ¶ 60. These contacts bear little significance when considered separately, but gain importance based on their relationship to the contract issue involved and the other contacts. *Modroo*, ¶ 60; *Restatement (Second) of Conflict of Laws* § 188 cmt. e. Here the location of the subject matter bears no significance. The subject matter of an insurance contract does not constitute a specific physical thing or a localized risk. *Modroo*, ¶ 60; *Restatement (Second) of Conflict of Laws* § 188 cmt. e.

¶45 Montana admittedly constitutes the "place of performance" as the accident occurred in Montana, the drivers of the vehicles in the accident were Montana residents, and these vehicles were insured in Montana. The place of performance bears little weight in choice-of-law determinations, however, when the place of performance is uncertain or unknown at the time of contracting. *Modroo*, ¶ 62; *Restatement (Second) of Conflict of Laws* § 188 cmt. e.

¶46 Montana constituted a potential place of performance as FIE agreed to pay UIM damages for "accidents, occurrences, and losses [which] occur within the United States . . . ." Montana did not become the place of performance, however, until Cady Tucker's accident occurred and Tucker's claims arose. We therefore accord this contact little weight as Montana's status as the place of performance was uncertain or unknown at the time of contracting. *Modroo*, ¶ 62; *Restatement (Second) of Conflict of Laws* § 188 cmt. e.

¶47 We are left to resolve a dispute that centers on the interpretation of the Idaho insurance policies issued to Idaho residents by corporations doing business in Idaho. Montana's interest in this dispute derives solely from its status as the place of performance. This fact does not create a materially greater interest in this dispute among Idaho parties that would warrant applying Montana law. We agree with the District Court that Idaho law applies to control the legal construction and effect of FIE's policy. *Modroo*, ¶ 63; *Restatement (Second) of Conflict of Laws* § 188.

¶48 *Whether the District Court correctly denied collateral source offsets from Tucker's wrongful death damages award.*

¶49 FIE claims that Tucker's award must be reduced by $298,433.35 to reflect all prior liability and UIM insurance payments already paid by the primary insurance policies. FIE contends that its policy constitutes an excess "umbrella" insurance policy that contractually requires it to receive credit for all amounts previously paid by other sources of insurance. In the alternative, FIE argues the applicability of the collateral source statute that allows offsets by law. Section 27-1-308(1), MCA, provides that "a plaintiff's recovery must be reduced by any amount paid or payable from a collateral source that does not have a subrogation right." Section 27-1-308(3), MCA, requires a jury to determine its award without consideration of any collateral sources. After the jury award, however, the trial judge must hold an evidentiary hearing to determine the existence and amount of collateral sources. Section 27-1-308(3), MCA.

17

¶50     The District Court scheduled an evidentiary hearing to determine the existence and amounts of any collateral sources received by Tucker.  The court stated at the outset of the hearing that it was looking for "hard evidence, not presumptions or formulas or -- but hard evidence that any of these settlements included a specific amount that can be utilized as a collateral source."  A most unusual proceeding ensued.  FIE relied generally on affidavits submitted by several of its agents.  The District Court deemed the affidavits to be inadmissible and FIE has not appealed this ruling.  Tucker's counsel was sworn as a witness and testified as to his interpretation of many of the exhibits introduced by FIE.  Tucker also called as a witness counsel for Hoctor, the other co-personal representative of the estate of Cady Tucker.  Hoctor's counsel provided his interpretation of various settlement agreements among Tucker, Hoctor, FICI, Safeco, and State Farm.

¶51     The District Court determined that FIE had the burden of providing evidence and proving the amount of offset to which it was entitled.  Tucker had pursued two separate claims, a survivorship claim and a wrongful death claim.  The District Court concluded that FIE had failed to meet its burden to prove sufficiently that Tucker had received duplicative damage awards.

¶52     FIE claims that the District Court erroneously placed the burden on it to establish the allocation of damages between survivorship and wrongful death.  FIE further claims that Tucker received double recovery based upon the District Court's erroneous finding that it could not allocate between the amount of survivorship and wrongful death damages that Tucker had received.  FIE admits that the defendant bears the burden of

18

proving the existence of collateral source offsets. FIE argues, however, that once the initial burden is met, the burden should shift to Tucker to establish the amount of the offsets. FIE claims that it met its initial burden simply by proving that Tucker's earlier settlements had included wrongful death damages. The burden shifted to Tucker at that point, according to FIE, to allocate her previously received settlements.

¶53    The parties cite numerous cases from other jurisdictions regarding which party should bear the burden of proof in demonstrating an entitlement to an offset. *See, e.g., Litho Color, Inc. v. Pacific Employers Ins.*, 991 P.2d 638 (Wash.App. Div.1 1999) (cited by FIE) and *PSE v. Alba General Ins. Co.*, 68 P.3d 1061 (Wash. 2003) (cited by Tucker). These cases allegedly offer conflicting holdings and competing rationales.

¶54    Tucker cites to *Hornung v. Estate of Lagerquist*, 155 Mont. 412, 420, 473 P.2d 541, 546 (1970), for the general proposition that the burden of proving an offset rests on the party who seeks an offset. FIE does not dispute *Hornung's* continuing vitality on this general point, but argues that it fails to address a situation where a party seeking an offset has demonstrated the existence of settlement funds to the other party from other sources and the other party has failed to allocate these other settlement funds. FIE argues that the burden of allocating those settlement funds for collateral source offsets shifts to the recipient of those settlement funds.

¶55    We also note that this Court faced a related claim in *Cottrell v. Burlington Northern R. Co.*, 261 Mont. 296, 863 P.2d 381 (1993). The jury returned a general verdict in excess of $1.3 million. The plaintiff had sought lost wages of $862,230 and

19

general damages from $700,000 to $1,000,000 for pain and suffering. The defendant railroad sought to offset the jury's general verdict by the amount of lost wages advanced by the defendant to the plaintiff and for medical bills paid by plaintiff's medical insurer.

¶56 The Court agreed with the plaintiff that it could not make an exact apportionment of the jury's verdict between general damages and wage loss. The jury's verdict exceeded $1.3 million. The Court nevertheless reasoned that the difference between the jury's verdict and the plaintiff's claim of general damages up to $1,000,000 meant that "at least $300,000 of [plaintiff's] recovery had to be compensation for wage loss." *Cottrell*, 261 Mont. at 309, 863 P.2d at 389. As a result, the Court remanded to the district court to determine the exact amount of the offset to which the defendant railroad was entitled based on its advancement of lost wages to the plaintiff. *Cottrell*, 261 Mont. at 309, 863 P.2d at 389.

¶57 The Alaska Supreme Court cited to *Cottrell* in *Turner v. Municipality of Anchorage*, 171 P.3d 180, 191 (Alaska 2007), for the proposition that "an offset would not be granted absent some positive proof that the defendant's payments coincided with the jury award." We agree. FIE cites several cases from other jurisdictions where the courts have determined that the plaintiff, who was a party to the earlier settlement, was in a better position to allocate the proceeds. *See, e.g., Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917 (Tex. 1998); *Knox v. County of Los Angeles*, 109 Cal. App. 3d 825, 836 (Cal. Ct. Apps. 1980). Tucker argues, however, that the same Idaho counsel represented FICI and FIE in the settlement negotiations. FICI settled with Tucker and Hoctor for the

20

$250,000 policy limit. Tucker received $180,000 and Hoctor received $70,000. Tucker points out that FICI, represented by the same counsel as FIE, made no attempt to apportion the settlement between the survivorship action and the wrongful death action. Tucker argues that FIE's counsel made no effort to apportion in order to gain possible leverage in the subsequent negotiations regarding the wrongful death claim.

¶58    FIE cannot claim to be in the position of an outsider to the settlement, similar to the defendants in *Mobile Oil* and *Knox*, with no control over its allocation among Tucker's claims. FIE has failed to meet its burden under *Cottrell* and *Hornung* to present "some positive proof" that FICI's settlement proceeds of $250,000 covered the same damages awarded by the jury for Cady's wrongful death. *Turner*, 171 P.3d at 191. We affirm the District Court's decision to provide FIE with no offset with respect to Tucker's $180,000 share of the $250,000 settlement proceeds received from FICI.

¶59    We turn then to the remaining settlements between Tucker and Safeco and State Farm. Tucker and Hoctor each received $100,000 from Safeco. All of the parties to the settlement agreed that the proceeds constituted survivorship damages under Montana law. Tucker's counsel testified at the hearing on offsets that the parties agreed that the settlement proceeds were intended to compensate Cady Tucker's estate for the survivorship claim. FIE failed to present any evidence at the hearing on offsets to refute this agreement. Once again FIE failed to meet its burden under *Cottrell* and *Hornung* to present "some positive proof" that Safeco's settlement proceeds of $100,000 covered the same damages awarded by the jury for Cady's wrongful death. *Turner*, 171 P.3d at 191.

21

We affirm the District Court's decision to provide FIE with no offset with respect to Tucker's $100,000 share of the $200,000 settlement proceeds received from Safeco.

¶60    Finally, Tucker and Hoctor divided evenly a $35,625 settlement with State Farm. Tucker points to the fact that she and Hoctor, as co-personal representatives of Cady Tucker's estate, divided evenly the State Farm settlement proceedings as evidence of the fact that the settlement proceeds covered their survivorship claims. Her counsel testified at the hearing on offsets that the settlement proceeds were intended to compensate Cady Tucker's estate for the survivorship claim. FIE offered no evidence at the hearing to contradict this claim. We affirm the District Court's decision to provide FIE with no offset with respect to Tucker's share of the $35,625 settlement proceeds received from Safeco.

¶61    Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER

22

Justice John Warner concurs.

¶62 I concur with the Court's opinion. I write to explain why I concur with the Court on Issue 2.

¶63 FIE appeals the District Court judgment, *inter alia*, because even though the tort case was tried in Montana using Montana law as it relates to tort damages, Idaho law was applied by the District Court to increase the judgment by $328,939.39 in pre-judgment interest and $281,646.46 as attorney fees. Neither of these amounts would be awarded under Montana law.

¶64 FIE argues Tucker is judicially estopped from the application of Idaho law to the insurance contract because in the Idaho courts she argued Montana law applies, and in the Montana courts she argues Idaho law applies.

¶65 The doctrine of judicial estoppel precludes a party to an action from taking a position inconsistent with the party's prior judicial declarations. *State v. Darrah*, 2009 MT 96, ¶ 12, 350 Mont. 70, 205 P.3d 792 (citing *Vogel v. Intercontinental Truck Body, Inc.*, 2006 MT 131, ¶ 10, 332 Mont. 322, 137 P.3d 573). It is an equitable doctrine intended to protect courts from being "manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories." *Nelson v. Nelson*, 2002 MT 151, ¶ 20, 310 Mont. 329, 50 P.3d 139. The party claiming judicial estoppel must show that:

> (1) the estopped party had knowledge of the facts at the time he took the original position;
> (2) the estopped party succeeded in maintaining the original position;
> (3) the position presently taken is inconsistent with the original position; and

23

(4) the original position misled the party so that allowing the estopped party to change its position would injuriously affect the adverse party.

*Darrah*, ¶ 12 (citing *Vogel*, ¶ 10).

¶66    In my view, judicial estoppel would preclude use of the "most significant relationship" approach of the Restatement (Second) of Conflict of Laws § 188, which we adopted in *Modroo*, if Tucker took inconsistent positions in Idaho and Montana relating to the interpretation of FIE's contract of insurance. However, a careful examination of the record reveals that Tucker did not take inconsistent positions concerning the application of Idaho law to the insurance contract.

¶67    In its briefing in the Idaho courts, Tucker was fearful that FICI would convince an arbiter that Idaho law should be applicable to liability and damage issues and therefore strenuously argued against arbitration. Still, in discussing the stacking of UIM coverage, Tucker argued in the Idaho courts that she could recover interest and attorney fees under Idaho law, in addition to tort damages under Montana law. In her complaint in Montana, Tucker alleged Idaho law applied to the insurance contract, and prayed for interest and attorney fees under Idaho law. Tucker's position in Idaho was consistent with her position in Montana and FIE was not misled so as to change its position. Thus, the doctrine of judicial estoppel does not apply to bar Tucker's claim under Idaho law for pre-judgment interest and attorney fees.

¶68    I agree with the Court's analysis under § 188 of the Restatement (Second) of Conflict of Laws. In relation to the insurance contract, the parties' contacts with Idaho

24

are more significant than with Montana. And, as judicial estoppel does not apply, I concur with the Court's decision.

/S/ JOHN WARNER

Justice Jim Rice joins in the foregoing concurrence.

/S/ JIM RICE