

DA 12-0200

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2013 MT 125

JUDITH NEWMAN, as Personal Representative
of the Estate of Karlye Newman,

      Plaintiff and Appellee,

  v.

SCOTTSDALE INSURANCE COMPANY,
and NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,

      Defendants and Appellants.

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and For the County of Lake, Cause No. DV 10-280
Honorable Deborah Kim Christopher, Presiding Judge

COUNSEL OF RECORD:

    For Appellant Scottsdale Insurance Company:

        Bradley J. Luck, Garlington, Lohn & Robinson, PLLP, Missoula, Montana

        Linda Wendell Hsu, Selman Breitman, LLP, San Francisco, California

    For Appellant National Union Fire Insurance Company of Pittsburgh, PA:

        Robert J. Phillips, Amy O. Duerk, Phillips Haffey PC, Missoula, Montana

    For Appellee:

        James A. Manley, Ann L. Moderie, Manley Law Firm, Polson, Montana

        Lawrence A. Anderson, Attorney at Law, Great Falls, Montana

        Elizabeth A. Best, Best Law Offices, Great Falls, Montana

        Thomas J. Beers, Beers Law Offices, Missoula, Montana

Submitted on Briefs:  December 12, 2012

Decided:  May 7, 2013

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 This matter arises from a related case involving the suicide of a 16-year-old girl, Karlye Newman, who was residing at the Spring Creek Lodge Academy in Thompson Falls, Montana, at the time of her death in October 2004. Spring Creek Lodge Academy was one of many "tough love" academic facilities associated with the World Wide Association of Specialty Programs and Schools, Inc. (WWASP). Following Karlye's death, Karlye's mother, Judith Newman, brought an action against the owner of the school Robert Lichfield, its on-site directors Cameron and Chaffin Pullan, Teen Help, and various related entities alleging, among other things, wrongful death, negligence, breach of contract, deceit, and constructive fraud. A court-ordered settlement mediation was conducted in February 2010 at which time Defendant Teen Help agreed to settle with Newman by assigning to her its rights to $3 million in insurance coverage. The settlement was later reduced to a judgment.

¶2 Claims against the majority of the remaining defendants were also settled before trial. A jury subsequently ruled in favor of Defendants Lichfield and Premier Educational Systems, LLC (f/k/a WWASP) and Newman appealed. We affirmed in part, reversed in part and remanded for a new trial. *Newman v. Lichfield*, 2012 MT 47, 364 Mont. 243, 272 P.3d 625 (*Newman I*— wrongful death action).

¶3 In August 2010, after settling with Teen Help and while *Newman I* proceeded to trial, Newman filed this action (*Newman II*—declaratory judgment/breach of contract action) against Teen Help's insurers, Scottsdale Insurance Company and National Union Fire Insurance Company, to collect on the settlement and judgment. She argued the

insurers breached their obligation to defend and indemnify Teen Help in *Newman I*. After nearly eighteen months of litigation, the Twentieth Judicial District Court entered summary judgment, determining that the insurers wrongfully refused to defend Teen Help and thus breached their contracts with their insured. As a result, the court held that Scottsdale and National Union were severally liable for the underlying judgment of $3,000,000. The court also awarded attorney's fees of $1,188,399.45, and interest on the underlying judgment totaling $568,767.12. Scottsdale and National Union appeal. We affirm in part and reverse and remand in part.

## ISSUES

¶4 A restatement of Scottsdale and National Union's issues on appeal is:

¶5 Did the District Court err in considering inadmissible evidence and facts beyond the allegations set forth in the *Newman I* Third Amended Complaint, and resolving disputed issues of fact?

¶6 Did the District Court err in finding a duty to defend under the insurance policies but not applying the policy exclusions?

¶7 Did the District Court err in calculating and awarding attorney's fees to Newman?

¶8 Did the District Court err in finding that Montana law controls?

¶9 For purposes of analysis, we consider the first and second issues together.

## FACTUAL AND PROCEDURAL BACKGROUND

¶10 The facts and procedural history pertaining to the underlying wrongful death action are set forth in *Newman I* and will not be repeated here. As noted above, following settlement of the wrongful death claim with Teen Help, Newman brought this

4

breach of contract and declaratory action in August 2010 against Teen Help's insurers, Scottsdale Insurance and National Union Fire Insurance. Scottsdale provided a commercial general liability (CGL) policy to Teen Help while National Union offered an excess, or umbrella, policy. Both policies obligated the insurers to defend and indemnify Teen Help against covered actions and contained combined policy limits of $3,000,000. Newman maintained that both insurers unjustifiably refused to defend and indemnify Teen Help in *Newman I*, and refused to pay the settlement that Teen Help negotiated with Newman.

¶11 Scottsdale moved to dismiss Newman's Complaint arguing that its policy excluded coverage for the claim against Teen Help. It based its assertion upon two exclusions contained in the CGL policy: (1) a "designated professional services" exclusion and (2) a "designated operations" exclusion. The "professional services" exclusion stated:

> With respect to any professional services shown in the Schedule, this insurance does not apply to "bodily injury," "property damage," "personal injury" or "advertising injury" due to the rendering or failure to render any professional service.

The "Schedule" section of the policy described "professional services" as "any and all professional exposures."

¶12 The "designated operations" exclusion stated:

> This insurance does not apply to any medical incident, "damages," "bodily injury," "property damage," or "personal and advertising injury" arising out of the operations shown in the schedule above.

5

The referenced "schedule above" described "excluded operations" as "all professional other than premises liability at scheduled locations." While the policy listed Teen Help's call center office in St. George, Utah, as the insured, there were no "scheduled locations" identified in the designated operations exclusion. The policy provided a definition for "coverage territory," however. Coverage territory was defined in part as "the United States of America (including its territories and possessions), Puerto Rico and Canada."

¶13    Scottsdale maintained that Newman's claim against Teen Help arose from actions that constituted "professional services." Scottsdale claimed that Newman's complaint alleging negligence and wrongdoing on the part of Teen Help constituted a challenge to the professional recommendation and placement services provided by Teen Help, and that such claims were excluded under the policy. Additionally, as the Complaint alleged Teen Help was jointly liable for the negligence and intentional acts of the other defendants, Scottsdale maintained that the actions of the other defendants were also "professional services" that were excluded from coverage by the "professional services" exclusion.

¶14    Applying the "designated" or "excluded operations" clause, Scottsdale further argued that because Karlye's death occurred at Spring Creek Academy in Montana, rather than the St. George, Utah, location, coverage was excluded and Scottsdale had no duty to defend Teen Help. Accordingly, Scottsdale asserted that because there was no coverage available to Teen Help as assignor, there was likewise no coverage available to Newman as assignee; therefore, the action should be dismissed.

6

¶15 National Union also filed a motion to dismiss with a brief on February 7, 2011, asserting that Newman had not alleged, nor could she allege, that the loss constituted an "occurrence" as defined by the policy. The insurer argued that Karlye's death was not an "accident," as suicide was a purposeful act for which the National Union policy did not provide coverage. National Union also claimed a "professional liability" exception to the policy. In addition, National Union asserted that, as an excess policy, it owed no duty to defend or indemnify until after Scottsdale's policy was exhausted.

¶16 National Union's policy provided, in relevant part, the following definitions, terms and conditions:

**II.    Defense**

    A.    We shall have the right and duty to defend any claim or **suit** seeking damages covered by the terms and conditions of this policy when:

        1.    The applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance and the Limits of Insurance of any other underlying insurance providing coverage to the **Insured** have been exhausted by payment of claims to which this policy applies; or

        2.    Damages are sought for **Bodily Injury** . . . covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the **Insured**.

.    .    .

**IV. Definitions**

    C.    **Bodily Injury** means bodily injury, sickness, disability or disease. **Bodily Injury** shall also mean mental injury, mental

7

anguish, humiliation, shock or death if directly resulting from bodily injury, sickness, disability or disease.

. . .

H.  **Occurrence** means:

1.  As respects **Bodily Injury** . . . an accident, including continuous or repeated exposure to conditions, which result in **Bodily Injury** . . . neither expected nor intended from the standpoint of the **Insured**. All such exposure to substantially the same general conditions shall be considered as arising out of one **Occurrence** . . . .

. . .

V.  **Exclusions**

O.  **Bodily Injury** . . . expected or intended from the standpoint of the **Insured**.

. . .

PROFESSIONAL LIABILITY EXCLUSION

This insurance does not apply to **Bodily Injury** . . . arising out of any act, error, omission, malpractice or mistake of a professional nature committed by the **Insured** or any person for whom the **Insured** is legally responsible.

¶17 While not raised by National Union in its Motion to Dismiss, National Union subsequently argued that the notice provisions of its policy had not been satisfied. Those provisions provided:

VI.  **Conditions**

F.  Duties in The Event Of An Occurrence, Claim Or Suit:

2.  If a claim is made or **suit** is brought against any **Insured** that is reasonably likely to involve this Policy you must notify us in writing as soon as practicable.

8

> H.  Legal Actions Against Us
>
> There will be no right of action against us under this insurance unless:
>
> 1.  You have complied with all the terms of this policy; and
>
> 2.  The amount you owe has been determined with our consent or by actual trial and final judgment.
>
> This insurance does not give anyone the right to add us as a defendant in an action against you to determine your liability.

¶18     In addition to responding to the insurers' motions to dismiss, Newman filed motions for summary judgment against both insurers, disputing the arguments set forth in their motions. She claimed, among other things, that the obligation to defend imposed upon an insurer exists if the complaint alleges facts which, if proven, would present a risk covered by the policy. She submitted that her complaints set forth adequate allegations, facts and claims to trigger coverage. Newman also argued that neither policy contained necessary definitions of such terms as "accident," "professional," "premises liability," "arising out of," and "operations"; therefore, the claimed exclusions were ambiguous and must be construed against the insurers. She requested that the court determine she was entitled to payment of the Teen Help settlement and judgment, interest on the *Newman I* judgment, and litigation costs for both *Newman I* and *Newman II*. In response to Newman's motion for summary judgment, National Union submitted a brief on March 28, 2011, arguing for the first time that Teen Help had never notified it of the pendency of the *Newman I* claims so as to enable it to tender a defense in that action.

9

¶19 In October 2011, the District Court denied the insurers' motions to dismiss and granted Newman's motions for summary judgment and declaratory judgment. Following a hearing requested by Newman, the court ordered Scottsdale and National Union to pay Newman the $3,000,000 in combined policy coverage, an additional $1,188,399.45 in attorney's fees, and interest in the amount of $568,767.12. The order also stated that legal interest would accrue at 10% per annum from judgment day on the $3,000,000 and the attorney's fees. Scottsdale and National Union each filed a timely appeal.

## STANDARD OF REVIEW

¶20 We review a district court's ruling on a motion for summary judgment de novo, applying the same criteria of M. R. Civ. P. 56 as did the district court. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3); *Labair v. Carey*, 2012 MT 312, ¶ 15, 367 Mont. 453, 291 P.3d 1160.

¶21 We review for correctness a district court's interpretation of law pertaining to a declaratory judgment ruling. *Billings Gazette v. City of Billings*, 2011 MT 293, ¶ 9, 362 Mont. 522, 267 P.3d 11.

¶22 The interpretation of an insurance contract is a question of law. We review a district court's conclusions of law de novo to determine whether they are correct. *Cusenbary v. United States Fid. & Guar. Co.,* 2001 MT 261, ¶ 9, 307 Mont. 238, 37 P.3d 67 (*citing Babcock v. Farmers Ins. Exch.,* 2000 MT 114, 299 Mont. 407, 999 P.2d 347).

¶23 We review the district court's decision to grant or deny attorney's fees for an abuse of discretion. A district court abuses its discretion when it "acts arbitrarily without conscientious judgment or exceeds the bounds of reason resulting in substantial injustice." *Slack v. Landmark Co.*, 2011 MT 292, ¶ 15, 362 Mont. 514, 267 P.3d 6.

¶24 We review de novo issues of law, including a trial court's decisions on directed verdict, choice of law, and collateral source offset. *Tucker v. Farmers Ins. Exch.*, 2009 MT 247, ¶ 23, 351 Mont. 448, 215 P.3d 1.

## DISCUSSION

¶25 *Did the District Court err in considering inadmissible evidence and facts beyond the allegations set forth in the* Newman I *Third Amended Complaint, and resolving disputed issues of fact?*

¶26 *Did the District Court err in finding a duty to defend under the insurance policies but not applying the policy exclusions?*

¶27 As noted above, the District Court concluded that Scottsdale and National Union each had a contractual duty to defend Teen Help in *Newman I* and that they breached that duty. It therefore granted Newman's motions for summary judgment as to liability of the insurers. We address the contentions of each insurer in turn.

## A. Scottsdale Insurance Company

¶28 Teen Help timely demanded a defense and indemnification from Scottsdale. Scottsdale rejected Newman's demand, but denies it breached its duty to Teen Help. It argued that it was required to determine whether it had a duty to defend Teen Help by evaluating the information available to it at the time the request to defend was presented. At the time the coverage determination was made, the only pleadings in *Newman I* were

11

the complaints, including the Third Amended Complaint, and related exhibits. Based exclusively upon the information contained in the Third Amended Complaint, Scottsdale concluded that the exclusions within its policy applied to Newman's claim and, as such, it had no duty to defend. Scottsdale claims on appeal that the District Court should have considered only the contents of the Third Amended Complaint and exhibits in determining the correctness of Scottsdale's conclusion. It asserts that the court erred by considering inadmissible evidence presented with Newman's motion for summary judgment, such as a Lichfield deposition transcript, the Teen Help telephone sales script and a settlement agreement.

¶29 Newman responds that an insurer has a duty to defend its insured unless there is an "unequivocal demonstration" that the claim does not fall within the insurance policy's coverage. She maintains that because policy exclusions are to be narrowly and strictly interpreted, Scottsdale should have filed a declaratory judgment action to resolve the issue of coverage rather than refusing to defend. Newman asserts that the exclusion language contained in Scottsdale's policy is "ambiguous, repetitive and circular" and contains terms subject to multiple interpretations because the policy does not provide the definitions upon which Scottsdale seeks to rely.

¶30 It is well-established that "where [an] insurer refuses to defend a claim and does so unjustifiably, that insurer becomes liable for defense costs and judgments." *Farmers Union Mut. Ins. Co. v. Staples*, 2004 MT 108, ¶ 27, 321 Mont. 99, 90 P.3d 381. In *Staples*, Kenneth Huntsinger, while driving near Havre, Montana, struck a horse named Frenchy. Huntsinger was injured and his car was damaged. *Staples*, ¶¶ 6, 9. As Frenchy

12

bore Matt Corcoran's brand, Huntsinger filed a complaint against Corcoran. *Staples*, ¶ 7. Corcoran was insured by Farmer's Union Mutual Insurance Company. *Staples*, ¶ 8. As litigation proceeded, it became apparent that Frenchy's ownership at the time of the accident was unclear. Additionally, it was unclear whether Frenchy had escaped from Corcoran's or Staples' pasture. As a result, Huntsinger filed an amended complaint against co-owner Raymond Staples. *Staples*, ¶ 10. Farmers Union refused to defend Staples as an "additional insured" because Farmers Union unilaterally concluded that Corcoran had sold his interest in Frenchy before the accident, and therefore coverage based upon ownership was no longer available. *Staples*, ¶ 11. As here, Staples eventually confessed judgment in favor of Huntsinger and assigned his rights under Corcoran's policy to Huntsinger. *Staples*, ¶ 12. The district court concluded, based upon the allegations in the amended complaint and the ownership dispute at the time, that Farmers Union had a duty to defend Staples. *Staples*, ¶ 13.

¶31 Farmers Union appealed and we affirmed. We explained that "Montana law is well-settled that an insurer's duty to defend its insured arises when an insured sets forth facts which represent a risk covered by the terms of an insurance policy." *Staples*, ¶ 20. "The insurance company must look to the allegations of a complaint to determine if coverage exists under an insurance policy, thus giving rise to the insurer's duty to defend." *Staples*, ¶ 20. We concluded that Farmers Union had breached its duty to defend and was therefore estopped from denying coverage. *Staples*, ¶ 28.

¶32 In the case before us, Scottsdale does not dispute that Teen Help was an insured. Therefore, in accordance with *Staples*, ¶ 20, we look to the facts alleged in Newman's

13

Third Amended Complaint vis-à-vis Teen Help, to determine whether these facts, if proven, would present a claim covered by the policy:

1. Teen Help was a limited liability company doing business in Montana.

2. Teen Help purported to help parents of troubled teens obtain placement in an appropriate treatment facility, but directed parents only to facilities owned and operated by Robert Lichfield. Teen Help was the marketing arm of the other defendants.

3. At all relevant times, Lichfield exercised control over all related entities, including Teen Help, controlling personnel hiring, student recruitment and solicitation, and student care, treatment and supervision.

¶33 In addition to the foregoing specific allegations against Teen Help, the Third Amended Complaint also alleged that all defendants were alter egos of one another, and that they jointly failed to implement adequate policies to protect the children in their care; failed to hire, train and supervise staff; failed to properly evaluate Karlye's needs; and failed to meet the accepted standard of care in providing mental health treatment to Karlye.

¶34 Scottsdale argues the District Court determined that its policy covered Newman's claims by erroneously considering evidence that came into the record after Scottsdale had made its decision—based upon the allegations of the Complaint and its exhibits—that the Complaint did not state claims for which the policy would afford coverage. Scottsdale claims it was required only to look to the Complaint to determine whether coverage for the claims existed, and that the court erred in looking at evidence outside the Complaint and resolving issues of fact on summary judgment. It does appear that, in part, the District Court took into account evidence outside the Complaint and its exhibits in

14

making its determination. However, even if we discount evidence outside the four corners of the Third Amended Complaint and its exhibits, we can still answer the duty to defend question through an analysis of the Third Party Complaint, the Scottsdale policy, and established case law defining the parameters of the duty to defend.

¶35 Scottsdale claims it had no duty to defend because exclusions in the policy clearly applied to Newman's claim. We disagree. Exclusions must be narrowly and strictly construed because they "are contrary to the fundamental protective purpose of an insurance policy." *Farmers Union Mut. Ins. Co. v. Oakland*, 251 Mont. 352, 356, 825 P.2d 554, 556 (1992). Moreover, because exclusions are contrary to the fundamental purpose of the policy, such exclusions are frequently subject to challenge for ambiguity or inconsistency. *Swank Enters. v. All Purpose Servs., Ltd.*, 2007 MT 57, ¶ 29, 336 Mont. 197, 154 P.3d 52. As such, the mere existence of the exclusions in Scottsdale's policy did not establish an "unequivocal demonstration" that the claim did not fall within the insurance policy's coverage.

¶36 Addressing the professional services exclusion, Scottsdale claims "[t]he distinction between professional services and nonprofessional services is marked by whether the insured is required to make a trained judgment," and that professional services "embrace[] those activities that distinguish a particular occupation from other occupations, as evidenced by the need for specialized learning or training—and distinguished it from ordinary activities in life and business." Claiming that its policy exclusions "contain plain and ordinary language," Scottsdale opines that Teen Help's

recommendation that Karlye attend Spring Creek constituted a professional service, coverage of which was precluded by the professional services exclusion.

¶37    Scottsdale relies upon *Fire Ins. Exch. v. Alsop*, 709 P.2d 389 (Utah 1985), in which a licensed chiropractor, Michael Alsop, provided chiropractic services to a woman during labor and delivery. The woman and child were injured during delivery and the woman sued several defendants, including Dr. Alsop. Alsop demanded that his homeowners insurance provided by Fire Insurance Exchange defend and indemnify him. Fire Insurance filed a declaratory action to determine whether the policy covered Alsop's actions or whether his claim fell within the policy's "professional services" exclusion. Fire Insurance prevailed. Scottsdale asserts that the professional services exclusion in its policy is similar to that in Alsop's Fire Insurance policy which the Utah Court concluded was "clear and unambiguous."

¶38    *Alsop* is distinguishable and does not help Scottsdale in the case at bar. There was no discussion in *Alsop* as to whether "professional" or "professional services" was defined in the Fire Insurance policy. However, it was undisputed that Alsop's services as a licensed chiropractor were professional services that required Alsop to undergo specialized training, education and licensing. As such, liability for Alsop's professional services was excluded under the professional exclusion clause. While not expressly equating Teen Help's employees with licensed chiropractors, Scottsdale insists that Teen Help's staff similarly rendered professional services in assisting in placements of troubled youth into Lichfield's schools and in Teen Help's participation in the operation

16

and planning of Spring Creek, thereby falling within the "clear and unambiguous" professional services exclusion. We find this analogy inapt.

¶39 A licensed chiropractor would obviously be called upon to render professional medical services. By contrast, Teen Help is described in the Third Amended Complaint as no more than a marketing arm of the other defendants, directing parents of troubled teens to facilities owned and operated by Lichfield as part of a civil conspiracy to profit at the expense of the safety and health of children. These allegations do not suggest the exercise of "trained judgment" or "specialized learning" unique to "professional services," as Scottsdale argues; rather, these allegations raise the specter of an injury caused by an occurrence resulting from non-professional services. Because non-professional services were alleged, a duty to defend was triggered.

¶40 We acknowledge that the Third Amended Complaint also alleged that all defendants jointly breached some professional obligations. However, we have held that a duty to defend is triggered where one portion of the complaint alleges facts which, if proven, would result in coverage, even if the remaining counts of the complaint would not be covered. *Home Ins. Co. v. Pinski Bros.*, 160 Mont. 219, 227, 500 P.2d 945, 949-50 (1972).

¶41 Further, although Scottsdale relies on the "professional services" exclusion in its policy as a basis for denying coverage, the policy does not define the terms "professional," "professional services," or "professional exposures," so as to alert the insured concerning what services are covered and what services are excluded. At a minimum, this renders the coverage confusing and ambiguous. It is well-established that

17

any ambiguity in an insurance policy must be construed against the insurer. *Wendell v. State Farm Mut. Auto. Ins. Co.*, 1999 MT 17, ¶ 14, 293 Mont. 140, 974 P.2d 623. As such, the District Court did not err in determining the professional services exclusion did not preclude a determination that Scottsdale had a duty to defend based upon the allegations set forth in the Third Amended Complaint.

¶42 Turning to Scottsdale's "designated operations" exclusion, Scottsdale claims the insurance policy provides coverage to Teen Help's St. George, Utah, location only, and therefore does not provide coverage for any "alleged liability [that] occurred in Montana at the Spring Creek facility." Again, we note that the policy exclusion does not define critical terms, including "professional," "scheduled locations," or "arising out of." Nor does it expressly state a "scheduled location," although it does provide for a "coverage territory" comprised of the United States of America. In an attempt to interpret the contract to give meaning to all parts of the policy, we find the absence of an expressly identified "scheduled location" and the expansive definition of "covered territory" confusing and ambiguous.

¶43 Furthermore, if we accept Scottsdale's interpretation of policy coverage, it appears coverage is illusory. According to Scottsdale, all of Teen Help's employees are "professionals" and any liability associated with their services is excluded from coverage under the professional services exclusion. Moreover, given Scottsdale's claim that the policy covers the St. George, Utah, premises only, the policy would appear to cover only the conduct of non-professional employees that occurs in the St. George, Utah, location. Given that the Utah office is a call center that is not open to customers or the public, it is

18

difficult to imagine a scenario under which coverage would be extended. We have held that policy language which renders coverage illusory is against public policy. *Hardy v. Progressive Specialty Ins. Co.*, 2003 MT 85, ¶¶ 20-22, 29, 315 Mont. 107, 67 P.3d 892.

¶44 As did the District Court, we construe the confusing policy provisions against Scottsdale and conclude that under a reasonable interpretation of the Third Amended Complaint and the Scottsdale insurance policy, the allegations of the Complaint were sufficient to trigger a duty to defend. Scottsdale does not deny that the Complaint alleges "bodily injury" and an "occurrence," both of which are covered under the Scottsdale CGL policy. We have held that where a complaint alleges facts which, if proven, would bring an event within the policy's coverage, the duty to defend is triggered. *Staples*, ¶ 20; *Pinski Bros.,* 160 Mont. at 227, 500 P.2d at 949-50. Based on the foregoing, we conclude that the Third Amended Complaint alleged facts which if proven true would bring the matter within Scottsdale's coverage. Therefore, we conclude the District Court did not err in finding a breach of the duty to defend, and in entering summary judgment in favor of Newman and against Scottsdale. *Staples*, ¶ 27.

**B. National Union Fire Insurance Company**

¶45 As did Scottsdale, National Union also argues on appeal that the District Court erred in determining it had breached its duty to defend its insured.

¶46 National Union provided excess insurance coverage for Teen Help from May 7, 2004, through May 7, 2005. Karlye died in October 2004. Newman filed her initial Complaint against Lichfield and others in October 2006. This Complaint did *not* name Teen Help as a defendant. She filed her Second Amended Complaint adding Teen Help

19

as a defendant on May 29, 2008, but it is unclear whether Teen Help was served with this complaint. Ultimately, she filed a Third Amended Complaint on December 29, 2008, and served Teen Help at that time. It is undisputed Teen Help did not notify National Union of the suit nor did it tender a request for defense at that time.

¶47 National Union first learned of the cause of action in January 2010 when Newman's counsel submitted a policy limit demand letter directly to National Union. The letter encouraged National Union to participate in a court-ordered settlement mediation scheduled for February 19, 2010. Upon receipt of the letter, National Union contacted Teen Help to obtain information and documentation. Teen Help was of marginal assistance, at best. National Union then contacted Scottsdale's attorney to obtain information. Scottsdale provided National Union with a copy of the Third Amended Complaint and informed National Union that Scottsdale declined to defend or indemnify Teen Help because Newman's claim was precluded under the professional liability exclusion contained in Scottsdale's policy.

¶48 After reviewing the Third Amended Complaint, National Union, in a letter dated February 9, 2010, denied coverage to Teen Help on the following policy coverage grounds: failure to exhaust primary coverage through Scottsdale, failure to establish that Scottsdale's policy did not cover the claim, failure to state a claim that constituted an "occurrence," and submission of a claim that was excluded under the policy's professional liability exclusion. Notably, at that time, National Union did not deny coverage based upon Teen Help's failure to notify it of the underlying lawsuit "in writing as soon as practicable."

¶49   Having denied coverage, National Union did not attend the settlement mediation but nonetheless encouraged Teen Help to contact it with questions or further information upon which it could reconsider its decision.  It is undisputed that Teen Help did not contact National Union with additional information or requests for assistance.

¶50   Subsequently, in August 2010, Newman initiated this action.  In its early filings in response to Newman's complaint and her motion for summary judgment, National Union continued to assert that it had no duty to defend Teen Help based upon the policy coverage grounds set forth above.  In its March 2011 response to Newman's motion for summary judgment, National Union argued for the first time that Teen Help failed to notify it of the lawsuit in a timely manner and that it was unfairly prejudiced by the lack of notice.  It asserted that the duty to notify was a "condition precedent to filing a lawsuit against National Union for any claim, including a breach of contract claim."

¶51   In October 2011, the District Court granted Newman's motion for summary judgment and denied National Union's motion to dismiss the action.  In its order, the court based its conclusion that National Union had a duty to defend Teen Help upon a determination that Teen Help was not a "professional" entity; therefore, the insurer could not rely upon the "professional services liability" exclusion in its policy.  The court did not address the other defenses raised by National Union.  Following entry of this order, Newman moved for a hearing to determine attorney's fees, costs and interest and for entry of judgment.  In December 2011, National Union responded to Newman's motion, arguing again that a judgment against it was barred based upon "lack of notice" and a failure by Teen Help to "tender a defense."   National Union asserted that it was

21

prejudiced in numerous ways by the passage of more than six years since Karlye's death and more than a year since Teen Help was served with a complaint. Unpersuaded, the court subsequently entered Judgment against both insurers, severally, as described above.

¶52     On appeal, National Union argues that its policy identified only two circumstances under which it had an obligation to defend Teen Help: (1) when the policy limits of Scottsdale's policy were exhausted by payment of settlement or judgment, and (2) when damages were sought for bodily injury covered by National Union's policy, but not covered by Scottsdale's policy. National Union claims that neither of these provisions was satisfied. Additionally, it claims that under the terms and definitions of the policy, Newman's claim did not constitute an "occurrence." The insurer further posits that the claim was precluded under the professional liability exclusion. Lastly, National Union maintains that Teen Help did not notify it of the filing of Newman's lawsuit and never made a demand upon it to tender a defense. The insurer asserts the District Court failed to enforce the contract as drafted and as required under well-established case law; therefore, judgment against National Union should be reversed.

¶53     Although the District Court addressed only the professional liability exclusion in its decision, we address the remaining arguments presented by National Union as well as the argument upon which the District Court ruled.

*Exhaustion or Inapplicability of Scottsdale coverage*

¶54     Reiterating that the case before us is a "duty to defend" case, we return to National Union's initial denial of coverage which precipitated its refusal to defend. In National Union's February 2010 denial letter, it claimed that its "coverage obligations have not

22

been triggered, as no information has been presented evidencing that all underlying coverage has been exhausted and/or that underlying coverage does not apply to this claim." The denial letter acknowledged, however, that National Union had been informed by Scottsdale that Scottsdale disclaimed liability based upon a professional liability exclusion contained in Scottsdale's policy, and that therefore Scottsdale's policy would not cover Newman's claim. National Union then denied coverage based upon its policy's professional liability exclusion, among other grounds.

¶55    National Union's position on this issue is somewhat confusing. At various times, it has acknowledged that Scottsdale's policy did not cover Newman's claim, and at other times argues that Scottsdale's policy did cover Newman's claim but Scottsdale failed to pay, and therefore Scottsdale's coverage had not been exhausted. Moreover, on appeal National Union presented the following issue: "Whether [National Union] had a duty to defend its insured under its Umbrella Commercial General Liability Policy for a claim that is not covered under the policy and, where unbeknownst to [National Union], the insured's primary insurer, Scottsdale Insurance Company declined to do so because the claim was not covered under its policy." As noted, the record indicates that National Union knew at the time it denied coverage to Newman's counsel, that Scottsdale had concluded that its policy did not cover Newman's claim for bodily injury. This knowledge raised the distinct prospect that National Union's duty to defend was triggered.

¶56    As acknowledged by National Union, an insurer has no obligation to look beyond the complaint in determining whether a claim is covered by a policy. What National

Union does not acknowledge is that once an insurer does look beyond a complaint, it may not then ignore the information obtained. *Revelation Indus. v. St. Paul Fire & Marine Ins. Co.*, 2009 MT 123, ¶ 30, 350 Mont. 184, 206 P.3d 919. National Union's knowledge of Scottsdale's position on coverage was not obtained through a review of Newman's Third Amended Complaint or the National Union policy but rather through communication with Scottsdale. As such, National Union became privy to facts beyond the allegations in Newman's Complaint, triggering the prospect of a duty to defend and/or indemnify based on the information discovered. *Revelation Indus*, ¶ 30.

¶57 As we explained in our Scottsdale analysis above, there must exist an unequivocal demonstration that the claim against the insured does not fall within the policy coverage before an insurer can refuse to defend; otherwise, the insurer has a duty to defend. *Staples*, ¶ 24. If an insurer unjustifiably refuses to defend a claim, that insurer is estopped from denying coverage. *Staples*, ¶¶ 27-28.

¶58 National Union's contention that it was entitled to reject Newman's request for a defense based upon the absence of evidence of Scottsdale's position on coverage is disingenuous. Moreover, Scottsdale's position on coverage could not supply an "unequivocal demonstration" that the claim did not fall under National Union's policy. Against this backdrop, we examine the other arguments posited by National Union.

"*Occurrence*"

¶59 National Union argued to the District Court and to this Court on appeal that in light of the fact that suicide is an intentional act, Newman's claim does not constitute an "occurrence"; therefore, the insurer was justified in denying coverage and refusing to

24

defend. The definition of "occurrence" in the policy requires that there be an injury "neither expected nor intended from the standpoint of the Insured." The Insured is Teen Help. Certainly, it did not expect or intend Karlye's suicide; therefore, her suicide could arguably constitute an "occurrence" as defined in the policy. Interposing Karlye's intent as determinative of the existence of an "occurrence" makes no sense under the contract because she is not the Insured. We therefore reject National Union's argument that it was excused from defending Teen Help because Karlye's suicide, being intentional, did not fall within the definition of an "occurrence."

¶60 National Union's interpretation of the term "occurrence" in a manner that precludes coverage does not supply an "unequivocal demonstration" that the claim is not covered under National Union's policy. National Union therefore was not justified in refusing to defend its insured based upon this defense.

*Professional Liability Exclusion*

¶61 We need not repeat the legal analysis set forth above vis-à-vis Scottsdale's professional liability exclusion. It is sufficient to note that the same analysis applies to National Union's policy and argument. Additionally, National Union's policy does not define terms used in this exclusion, i.e., "arising out of," "professional," or "professional nature." As we noted above, without such definitions, the exclusion fails to alert the insured as to what services are covered and what services are excluded, thereby rendering it confusing and ambiguous. We construe this exclusion against National Union. *Wendell*, ¶ 14.

25

¶62 Furthermore, as we explained above, exclusions are contrary to the fundamental purpose of an insurance policy. The mere existence of exclusions in the insurance policy, even exclusions that are not construed against the insurer, do not establish an "unequivocal demonstration" that the claim does not fall within the policy's coverage.

*Notification*

¶63 Lastly, National Union argues that because Teen Help did not timely notify it of the underlying law suit or tender a defense, it could not have breached its duty to defend.

¶64 As noted above, in February 2010, National Union denied coverage to Teen Help based on its policy definitions and exclusions. In later seeking to dismiss Newman's claim in this case on February 7, 2011, it argued to the District Court that the definitions and exceptions under the policy established it owed Teen Help no duty of defense or indemnification. Subsequently, in March 2011, National Union first raised the argument that Teen Help failed to timely provide it with notice of the claim and that it was prejudiced by the failure. The insurer repeated this argument throughout the duration of the District Court proceeding but the court was not persuaded.

¶65 On appeal, and relying upon *Steadele v. Colony Ins. Co.*, 2011 MT 208, 361 Mont. 459, 260 P.3d 145, National Union argues that "Montana courts have long held that an insured's failure to comply with a notice condition in an insurance policy bars recovery under the policy." National Union maintains that the District Court erred by not considering the prejudice suffered by National Union based upon Teen Help's failure to notify it of Newman's claim.

¶66     In *Steadele*, we concluded that the district court properly granted the insurer's motion for summary judgment based upon its complete lack of notice of the pendency of any claim against its insured, until more than 60 days after a default judgment in the approximate amount of $1.88 million had been entered in favor of Steadele and against the insured. *Steadele*, ¶¶ 8, 23. When Steadele attempted to recover the judgment amount from Colony, Colony argued that the lack of notice of the claim severely prejudiced it. We observed that because of the lack of notice, Colony was completely deprived of the ability to investigate, locate witnesses, appoint counsel or negotiate a settlement and therefore suffered prejudice. *Steadele*, ¶ 28.

¶67     There are notable distinctions between *Steadele* and the case before us. For one thing, National Union was apprised of the pendency of the claim before judgment rather than after, and made the calculated decision to reject the claim on the basis of policy coverage defenses. The most significant distinction, however, is that in *Steadele,* Colony Insurance asserted from the inception that because the insured never notified it of the litigation, it was deprived of the ability to investigate and assess the validity of the claim. By contrast, upon learning of the litigation against its insured, National Union relied on multiple policy defenses in initially denying coverage to Teen Help, and in later responding to Newman's complaint. Lack of notice was not raised as a basis for denying coverage until over a year after National Union first refused to defend or indemnify its insured.

¶68     Numerous  jurisdictions have held that where an insurer denies liability on some other policy or coverage ground, the insurer cannot thereafter rely on the insured's failure

27

to give reasonable notice as a ground for avoiding liability. In other words, the insurer waives its right to argue "failure of notice" once it has denied coverage on other grounds.

¶69   In *Travelers Ins. Co. v. Peerless Ins. Co.,* 287 F.2d 742, 747 (9th Cir. 1961) (applying Oregon law), the Ninth Circuit Court of Appeals held that if an insurer denies liability to the insured on grounds other than those relating to defects in the notice, compliance with the requirements as to notice will be deemed waived. *See also Coulter v. American Employers' Ins. Co.*, 78 N.E.2d 131, 136 (Ill. App. 1948) ("It is a well-settled rule that when one party to a contract refuses to perform and bases its refusal on one ground it waived all other grounds, or is estopped when suit is brought, from setting up other grounds for its refusal."); *Travelers Ins. Co. v. Reed Co.*, 135 S.W.2d 611 (Tex. Civ. App., 1939) (By denying liability on the ground that claimant's petition against insured contained "no allegation of bodily injury accidentally sustained," Traveler's waived its later argument that it did not receive due notice of the suit.); and *Great Am. Ins. Co. v. General Ins. Co.,* 475 P.2d 415, 419 (Or. 1970) (Holding that the rule that defects in notice are waived by a denial of liability on other grounds is "fundamental, and scarcely needs to be supported by the citation of authorities."). Applying these authorities to the case before us, we conclude that by denying liability on other grounds for over a year after notice of the claim, National Union waived its right to now rely on defects in notice.

¶70   National Union argues that the lack of timely notice of the pendency of the complaint against Teen Help prejudiced its opportunity to investigate the claim, retain counsel, develop a trial strategy, and engage in discovery and perhaps settlement. We

28

reject this argument for two reasons. First, we note that in the cases cited immediately above, prejudice was simply not addressed. This makes sense because, logically, once one waives the right to invoke an argument, the various components of that waived argument—including as here, prejudice resulting from lack of notice—are simply not relevant. Second, even if we were to consider the prejudice argument, it is belied by the fact that National Union made a conscious decision to deny coverage and a defense from the outset, based upon its asserted policy exclusions and defenses. It did not ever seek to retain counsel, investigate the claim, or develop a trial or settlement strategy. Thus, not only is the prejudice argument irrelevant in the face of waiver, it is wholly unsupported in the record.

¶71 For the foregoing reasons, we conclude that National Union has waived its right to now claim that lack of timely notice by the insured is fatal to this case. Further, we conclude that the insurer failed in the District Court and fails here to "unequivocally demonstrate" that Newman's claims against Teen Help did not fall within the policy coverage. Because coverage of Newman's claims was arguably available under the National Union policy, it had a duty to defend. It could have attended the mediation in defense of Teen Help, and either negotiated a settlement or insisted upon taking the case to trial. In the meantime, it could have sought a declaratory judgment that it had no duty of indemnification under the policy. *Staples*, ¶¶ 26, 28; *Mt. W. Farm Bureau Mut. Ins. Co. v. Brewer*, 2003 MT 98, ¶ 30, 315 Mont. 231, 69 P.3d 652. It did none of these things. Pursuant to the foregoing authorities, we therefore conclude the District Court did

29

not err in denying National Union's motion to dismiss and granting Newman's motion for summary judgment against National Union for its refusal to defend Teen Help.

¶72 *Did the District Court err in calculating and awarding attorney's fees to Newman?*

¶73 In addition to entering judgment against the insurers for $3,000,000, the District Court also awarded Newman $1,188,399.45 in attorney's fees, over and above the $3 million judgment. The court explained that established case law allows an insured the right to recover attorney's fees in the event an insurer breaches its duty to defend. *See e.g. Brewer*, ¶ 14. The amount awarded was based upon the $3,000,000 judgment awarded in *Newman I* and the one-third contingency fee arrangement Newman and her attorneys had agreed upon in *Newman I*. In reaching the fee award, the court considered the eight factors set forth in *Stimac v. State*, 248 Mont. 412, 417, 812 P.2d 1246, 1249 (1991), which courts have used "when assessing whether to award the full amount of the contingent-fee agreement as a reasonable attorney's fee . . . ." In *Stimac*, the plaintiffs had a contingency fee agreement with their counsel, who pursued and recovered on their behalf contested wages from the defendant. The wage recovery statute at issue provided that employees who recovered wages were entitled to the recovery of reasonable attorney's fees. Section 39-3-214, MCA.

¶74 Scottsdale argues that awarding Newman attorney's fees in *Newman II* for work performed in *Newman I* and based upon the contingency fee agreement entered in *Newman I* was error. Scottsdale acknowledges that Newman, as assignee, stands in the shoes of first-party insured Teen Help and therefore is entitled to the same fees to which

Teen Help would be entitled had Teen Help sued Scottsdale. In other words, Scottsdale maintains that as a first-party assignee, Newman should be allowed to recover only those fees to which Teen Help would be entitled had it directly sued the insurers for declaratory relief. The insurer urges us to reverse the District Court's ruling vis-à-vis attorney's fees and remand with instructions to the court to recalculate reasonable first-party fees associated with legal representation in *Newman II*.

¶75 Newman counters that she has a right to attorney's fees and that her contingency contract with her attorney is the operative contract upon which to base the amount of fees. She asserts that the method used to calculate attorney's fees is within the District Court's discretion and that the court correctly exercised its discretion by holding an evidentiary hearing, taking expert testimony, and applying the factors set forth in *Stimac*.

¶76 It is undisputed that Newman, as Teen Help's assignee, should be allowed to recover fees for services rendered by counsel in enforcing the insurance contract, just as first-party insured Teen Help would have been able to do had it instituted the contract and declaratory action against Scottsdale. As we noted in *Skauge v. Mountain States Tel. & Tel. Co.*, 172 Mont. 521, 526, 565 P.2d 628, 631 (1977), "[w]hen there is an assignment of an entire claim there is a complete divestment of all rights from the assignor and a vesting of those same rights in the assignee." As such, the District Court correctly concluded that Newman was entitled to reasonable attorney's fees for her declaratory judgment action.

¶77 Where the District Court erred, and as a result abused its discretion, was when it based the amount of the fee award on Newman's contingency agreement executed in

*Newman I*, and did so in reliance on *Stimac*. While it is clear that Newman incurred legal fees under the contingency fee contract with counsel in *Newman I*, *Newman I* was a separate tort action and the fee arrangement in that case does not transfer to this case. Again, as Newman stepped into Teen Help's shoes by virtue of the assignment, Newman assumes Teen Help's rights and nothing more. *Skauge*, 172 Mont. at 526, 565 P.2d at 631.

¶78 Because Teen Help as assignor had no contingency fee agreement to impose in the declaratory action, it follows that Newman as assignee cannot impose a contingency fee agreement in the declaratory action. *Stimac* is inapposite, as it analyzed the application of a fee agreement entered for the express purpose of representation in the case before the court, unlike the case here. Thus, it was error for the District Court to import the tort action contingency fee agreement between Newman and her lawyers, into the declaratory action in which Newman was acting as assignee of Teen Help's rights.

¶79 The foregoing analysis is buttressed by Newman's arguments on appeal. Newman argued in her brief on appeal that the District Court based its fee award on the services provided by her attorneys in the declaratory action, i.e., *Newman II*, and *not* the work performed for *Newman I*. She stated:

> The testimony at the evidentiary hearing was directed to the attorneys' work in the present declaratory judgment and breach of contract case. [*Newman I*] was only discussed as an example of why contingency fee agreements are reasonable and necessary in litigation.

.   .   .

Work performed in [*Newman I*] was not presented at the evidentiary hearing as basis for the fee award in the present action. The District Court clearly understood that point.

¶80 Because the District Court was tasked with determining a fee award based exclusively on services performed in *Newman II*, it should not have considered Newman's contingency arrangement in *Newman I* or the factors set forth in *Stimac*. We therefore reverse the amount of the attorney's fees awarded by the District Court and remand for a calculation of reasonable attorney's fees based upon what Newman, as Teen Help's assignee, would have been able to recover for her attorney's time and expenses incurred in pursuing insurance coverage from the defendants. As we held in *Pinski Bros*., 160 Mont. at 228, 500 P.2d at 950, the seminal decision addressing the recovery of attorney's fees in an action between an insurer and insured, "the wrongful acts of the insurer . . . and its refusal to defend this action . . . constituted [a] breach[] of its obligation and duty rendering the insurer liable for damages by way of attorney's fees, expenses, and court costs occasioned thereby." *See e.g. Lindsay Drilling v. U.S. Fidelity & Guar*., 208 Mont. 91, 97, 676 P.2d 203, 206 (1984); *Truck Ins. Exch. v. Woldstad*, 212 Mont. 418, 423, 687 P.2d 1022, 1025 (1984); *Goodover v. Lindey's Inc*., 255 Mont. 430, 448, 843 P.2d 765, 776 (1992).

¶81 *Did the District Court err in finding that Montana law controls?*

¶82 The District Court concluded, without analysis, that Montana law controlled the declaratory action. Urging this Court to apply the "most significant relationship" test set forth in *Tucker*, ¶ 41, Scottsdale argues that the insurance policy was issued in Utah, to residents of Utah, covering property in Utah; therefore, Utah law controls.

33

¶83 Newman responds that, in this case, there is no material difference between Utah and Montana's principles of insurance contract interpretation; consequently, application of Montana law should be upheld. *Modroo v. Nationwide Mut. Fire. Ins. Co.*, 2008 MT 275, ¶ 23, 345 Mont. 262, 191 P.3d 389. Newman also argues that throughout the District Court proceeding Scottsdale conceded that applicable Montana law was consistent with Utah law, and that the District Court relied on Scottsdale's concession on this point. Newman asserts Scottsdale may not now challenge the correctness of the District Court's determination.

¶84 The record supports Newman's argument. We have repeatedly held that we will not put a district court in error for an action in which the appealing party acquiesced. *Horn v. Bull River Country Store Props.*, 2012 MT 245, ¶ 34, 366 Mont. 491, 288 P.3d 218. Moreover, we do not address a party's change in legal theory on appeal nor do we render a district court's decision incorrect when it was not given an opportunity to correct itself. *Day v. Payne*, 280 Mont. 273, 276-77, 929 P.2d 864, 866 (1996); *State v. Weeks*, 270 Mont. 63, 85, 891 P.2d 477, 490 (1995).

**CONCLUSION**

¶85 For the foregoing reasons, we affirm the District Court's order of summary judgment as it pertains to Scottsdale and National Union, its award of interest on the underlying judgment, and its application of Montana law. We reverse the court's ruling on attorney's fees and remand with instruction to recalculate reasonable attorney's fees based upon the legal services provided in *Newman II*.

/S/ PATRICIA COTTER

We Concur:

/S/ MIKE McGRATH
/S/ JIM RICE
/S/ BETH BAKER
/S/ BRIAN MORRIS

Justice Michael E Wheat dissents.

¶86    I concur with the majority opinion in all respects except the issue related to attorney fees, and in that respect I dissent from the Court's reversal of the District Court's ruling on attorney's fees.  The method of calculation of attorney's fees is in the discretion of the court, *Tacke v. Energy West Inc.*, 2010 MT 39, ¶ 38, 355 Mont. 243, 227 P.3d 601, and here the court found that the contingency fee was the proper measure based on the amount Newman would have to compensate her attorneys, the complexity of the case, the risk of no recovery, and the understanding that the underlying judgment presumed the present suit.  Moreover, § 25-10-301, MCA, allows the measure of attorney's fees to be left to either express or implied agreement, and in the absence of an agreement covering the present case, it appears that the court implied a contingency agreement at the 1/3 rate used by the parties in the underlying case.

¶87    The court held an evidentiary hearing on fees and determined that a contingency basis was the proper measure of attorney's fees based on the testimony provided and the nature of the case.  Because of the deferential standard of review and the assignment of

35

rights, I do not think that the court clearly abused its discretion by applying the same contingency basis that Newman and her attorneys used in the underlying action.

¶88    For these reasons, I would affirm the District Court's ruling on attorney's fees.  I respectfully dissent from the majority's failure to do so.


                                        /S/ MICHAEL E WHEAT